Next case is number 24-3112, Charice Sargent against the School District of Philadelphia. Mr. Mitchell. Good morning, Your Honor. May I please report, I'm Jonathan Mitchell on behalf of Plaintiff's Appellant Charice Sargent et al. We'd like to reserve five minutes for a vote.  School District of Philadelphia changed the admissions policies to its elite criteria-based high schools with the conscious and a valid aim of altering the racial makeup of those schools. Yet the District Court entered summary judgment for the School District, holding that the plaintiffs had failed to produce any evidence that the School District's changes to its policies were racially motivated, and further holding that the plaintiffs had failed to produce evidence of a racially disproportionate effect. Each of these decisions is wrong and should be reversed. To survive a motion for summary judgment, the plaintiffs need only to show that a genuine factual dispute exists over whether these changes to these schools' policies were racially motivated and that a genuine factual dispute exists over whether they had a racially disparate impact. Let's put to the side the intent for a moment. You seem to concede that there is an independent need for disparate impact. I'd like to understand better what you think that disparate impact needs to show. Taking account of the dissentials that we have from Justice Alito, joined by Justice Thomas on the Boston Coalition and Coalition for TJ, that seem to put aside the idea that there is a separate element, a requirement, of disparate impact. So is it enough that there is a claimed effect, a consequence, on an individual plaintiff, or is there a requirement to show that there is an effect in the aggregate? Well, there used to be a racially disparate effect, and in order to win damages, the plaintiff, I think, would have to show that there was a correlation between what the school district did and the harm that that individual plaintiff suffered. But to show a violation of the law, it's enough, I believe, to show, first, there has to be racially discriminatory motivation. Disparate impact alone will never be enough to establish liability or violation of the law under any federal anti-discrimination law. But in addition to that racially discriminatory motive, there needs to be some evidence that the goal was achieved, the goal of altering the racial composition of the schools. And we certainly have enough evidence to create a fact question on that issue, both the racial motivation point and the disparate impact point. Now, when it comes to the individual, they will need to show, in some way, that their inability to get into the school of their choice was caused by the change in admissions policies. That goes to the question of damages. Will it be enough to get damages, compensatory damages, or something of that sort? Well, your position is that disparate impact requires a showing in the aggregate. Correct. And what do we do with a record here where you didn't put forward an expert, and we don't have any experts saying that here it's statistically significant? There's no need for an expert on something like this, Your Honor, because any change, any admissions policy at all will have a racially discriminatory impact, just because whatever criterion you establish, whether it's academics or athletics or anything else that you might think about, those things will never be equally distributed across the races. So even the pre-2021 policies had a racially discriminatory impact that wasn't illegal, because none of that was motivated by a desire to suppress or increase the representation of a particular race. But the answer can't be that any change in policy is going to have some effect on racial composition. Wouldn't that just reduce what you're agreeing is a two-part test to a one-part test of just showing intent? It comes close to that, but I wouldn't quite go that far. It has to be statistically significant. I believe that's right, yeah. It has to be statistically significant. It's not enough to say it would change. If it changes 0.01 or 1.7, it doesn't matter. But to Judge Krause's question, without the expert, without a statement of statistically significant, why was the district court wrong? Well, we have evidence in the record showing that there was a dramatic drop in whites and Asians admitted to Carver and Central and Palumbo and a dramatic increase in blacks and Hispanics admitted to that. Yet Masterman went the other way. True, right. So the evidence is mixed. The evidence is mixed. I mean, this may have been a ham-fisted attempt to change racial motivations. We don't know exactly what they wanted in terms of how the distributions would be among the different schools. There's some evidence in the record suggesting that some of these elite schools didn't have enough whites or Asians. Like Carver, prior to the changes, Carver had more blacks in the student body than there were in the overall population of the city of Philadelphia. I think part of the issue though is that we have, like from Dr. Wolford, we have some statistics that go back to the 2019-2020 school year. And so I'm looking at appendix page 137 right now. And that shows that between the 2019 school year and the 2020 school year, the percentage enrollment of Asian students dropped from 17% to 11%. So there was a 6% drop. That's before any of the events that you're complaining of, right? And so then we fast forward and we see another drop from 2022 to 2023. There was a 3% drop. So without an expert, how do I know that the 3% drop that happened to correspond in time with the change in policy is attributable to that policy as opposed to like whatever other statistical noise was in that led to the drop five years ago? Well, there will always be changes in racial enrollment for reasons that may not be explainable. That's true. But in order to show that we are entitled to a trial, and again, we don't need to prove our case here. We're only contesting the summary judgment that was rendered against us. We only need to show to get to trial that a reasonable fact finder could reach that conclusion. And we don't need an expert at this stage because the evidence of racial motivation is enough to create a fact question without the expert. And when it comes to disparate impact, it's very hard to win a case if you're admitted that there's a racial motivation. And then you just say, well, even though we were trying to change the racial makeup of our schools, we just did it in such an incompetent fashion that didn't have any racial motivation. But there's no admitted racial motivation here. I'm sorry? There's no admitted racial motivation. They're not admitting that, but we have all sorts of documentary evidence showing the guards and guardrails documents at the very outset on page 1421 of the record where they say we are going to increase the percentage of blacks and Hispanics that are deemed qualified to attend our criteria-based schools from a certain percentage, I forget exactly what it was, to something else much higher with the goal of getting it toward 52 percent. So it mirrors the overall population of the city as a whole. That's what we're looking at. Does that aspiration apply to all 19 of the application schools? We're not talking about catchment schools, learning schools. Does that apply to all 19 or just to the four schools that we've been focused on? The way I of students who will be qualified to attend any of these criteria schools, this is what they're saying is an aspirational matter. It's going to increase from a certain percentage to a percentage that more closely resembles the overall makeup of the city population. But then they go on to change the definition of what it means to be qualified. The district court tried to dismiss our reliance on this document by saying it's just expressing the goal to increase the number of qualified students. And there's nothing wrong with that in the abstract if you're not changing the definition of what it means to be qualified. But what if the change in qualifications is like here we have, you know, before you could get a C and still be qualified, and now they're saying only A's and B's. And so if it's something like that, why is that discriminatory? Why is that evidence that they were, you know, playing with things to make more blacks and Latinos qualified? Well, in some respects they were raising standards by no longer allowing you to get in with a C. That was one of many changes they made. And they also made the change of we're going to admit students by lottery once you clear that minimum threshold rather than having the principals choose among the most qualified students in that group. So all of these changes were being made to change what it means to be qualified. And then they will admit the students by random lottery among those who meet that qualified threshold. So can I just ask a thought? So do you – the Pew study, one of the many things that the Pew study found was that unqualified students were getting into these schools. And that was because of subjective factors in the admissions process. So those have been removed. Do you agree with me that far? Yeah, I believe that's all right. I mean, the evidence in the record shows there may have been other motivations in addition to the desire to change racial composition that undergirded the school district's decision to make these changes. We agree with that. But we still can show that this was unlawful if racial motivations played any role in the decision. You can imagine a scenario where a university or a high school could adopt a new policy of admissions for both benign reasons and also nefarious reasons at the same time. You could have a decision where a school says we're going to start awarding athletic preferences because we want to have better sports teams, but also because we have too many Asians, and Asians don't do as well in athletics as other groups. If both of those motivations exist simultaneously, the change of policy is still legal, even though the mere desire to have a better sports team is not in itself a problem under federal anti-discrimination law. We have case after case that's talked about a consideration of race being permissible. It is, yes. And is your argument that that has changed after students for fair admissions? No, race can still be considered. I think even after SFFA, it's not illegal to consider race. What you can't do is discriminate on account of race. So you can look at race. You don't have to close your eyes to the racial demographics of a person who's applying to your high school or university. What you can't do is treat people differently on account of race. Here we have a policy that on face is race neutral. Yes, it is. It moved from subjectivity to objectivity. More objectivity. I wouldn't quite go so far as to say that it's completely objective, but they were attempting to make it more objective than before, yes. So if race can be considered and we have a race neutral policy that has been articulated as based on other things other than racial motive, why aren't we in that realm of cases that involved consideration of race? Because it was being done. The reason they made these changes was to alter the racial makeup of their school. A policy could be facially neutral in the sense that it does not require consideration of race on the face of the policy, but can still be adopted because the school district's motivation was to reduce the representation of Asians at certain schools and reduce the representation of whites and increase the representation of blacks and Hispanics. And if you do it for that motivation, it's a problem. Same thing with the grandfather clause. The grandfather clause was facially neutral. It said if you want to vote in Oklahoma, your grandfather had to be eligible to vote. That's racially neutral on its face. But of course, the reason they adopted that was to prevent blacks from voting because the grandfathers were slaves and weren't eligible to vote at the time. I'm not trying to analogize the two, but the point is the mere fact that it's facially neutral does not mean that the school district's entitled summary judgment when there's at least some evidence in the record that racial motivations played a part in the school district's decision to adopt this policy. And again, that's all we need to defeat summary judgment at this stage. I see I'm into my rebuttal time. I'm happy to answer other questions. You're on our time. I guess we're asking questions. So where you just ended was, you know, some evidence of discriminatory intent is all we need to defeat summary judgment. But I think where we started a few minutes ago was we also need some evidence of the impact. That is true. We need both. Right. So the district court rendered summary judgment against us. If we want to defeat that on appeal, we have to show that we A, had some evidence of racial motivation enough to get And so how do we assess impact when there was a flaw in the prior system? And what I'm referring to as a flaw is unqualified people getting it. Right. So any admissions policy is going to have a racially disparate impact, unless it's one of those rare situations where the criteria is entirely symmetrical among the races. If you think back to Griggs against Duke Powell, which defines disparate impact, it said if you acquire a high school diploma for this job, that's a racially disparate impact, simply from the fact that statistically blacks are less likely to graduate from high school. Doesn't make it unlawful, but that's enough to me. So I mean, for instance, an expert could say that that flaw in letting unqualified students into these criteria schools resulted in, let's say, over-representation of white students. And so when that flaw was removed and then this new policy came in, I can tell you that this is the actual impact. But we don't have any kind of that analysis. This is not conducive to expert testimony, because the ultimate question here, Your Honor, is whether the change in policy was adopted because of, and not in spite of, the racial effects it would have. So what Your Honor just described is a hypothetical where there's an old system where unqualified people are getting in because of the subjectivity and whites are being over-represented. It's perfectly lawful for a school district to change that if the motivation is to make it more objective and to make sure we don't have unqualified people getting in because they're doing it in spite of the racial impact it will have on whites. The problem arises if there's evidence suggesting that the change was adopted because of a desire to reduce whites. But what if, to Judge Freeman's question, what if there was indisputable evidence that the prior regime resulted in 20 percent more white students getting admitted to these four schools than deserve to get admitted, and 10 percent more Asian students getting admitted to these schools that deserve to be admitted? Would it not be legal for the school district to say, we are going to correct that injustice by cutting down 20 percent, we're going to reduce the whites 20 percent, and the Asians 10 percent because we have all this evidence? Would that not be legal even though that is done with the intent of changing the racial compositions? I don't think they should phrase it in the way Your Honor suggested, but it would be legal if... Again, what I'm getting at is a remedial scheme. Yes. And it's interesting here because there's a lot in the record that suggests that the school board and those that were motivated to make these changes thought there needed to be some racial remediation going on here. In fact, your friend, Amicus, on the other side, that brief also gestures at that. So is this case a remedial case or not? Well, it's both. I think there were many different factors in play. Some of the motivations appear to be a desire to make the system more objective as the Pew study supports and as others testified in the record. But there's also evidence in the record suggesting that this was done in order to increase the representation of blacks and Hispanics at the elite criteria-based school at the expense of whites and Asians. Both of these factors were in play. And I think to answer your question... Right, but what I'm asking though is if what you just said is done to remedy past injustice, it's okay. But if it's done to create some sort of perfect racial balancing, it's not okay. Is that your position? What it ultimately comes down to is where the change is made because of rather than in spite of the racial effects that you have. So you can imagine a scenario where the school district knows, consciously is aware, that the change in admissions policy will reduce the number of white and Asian students. That is not by itself enough to show unlawful racial motivation. The question is, did they adopt that policy because they desired that result? Or did they adopt the policy for some other reason, knowing it would have this effect, but adopted it in spite of the fact that it would have that racial effect? That's the question that has to be answered at trial. And then for purposes of this court where we're on summary judgment, the question is, do we have at least some evidence in the record that could allow a reasonable fact finder to conclude that the policy and changes were made because of and not in spite of the effects it would have on the racial makeup of the system? But your turn in this question is going to where it's but because of is remedial. So what's the state of the law presently as you understand it? When you say remedial, in terms of grutter or remediation or... To remedy a record of past discrimination. But what I'm suggesting here is the record has a lot of suggestion that there was past discrimination here, but there's no sort of clear proof that I could see that, you know, Asians were preferred or whites were preferred or any other group was preferred or disadvantaged. All we know for sure is that the numbers as distributed by race were quite unequal relative to the Philadelphia population at large. We can all agree on that. Oh, correct. Yeah, that's for sure. Right. And again, if the changes in admissions policies were being made for a lawful purpose, knowing they would have a racial impact, but the motivation and desire to make the policy was not to change the racial makeup for its own sake. But to remedy the past. Then it's okay. But again, for the city to prevail here at the summary judgment stage, they need to show that the evidence of the record shows that there is no evidence that racial motivations, changing racial composition for its own sake played even a part in the decision and that no reasonable fact finder could conclude that it played even such a part. That's a very high burden. I want to understand what you're saying. When you say it would be lawful, do you mean that strict scrutiny would apply, but that's a compelling interest? That's how I read the court's decisions. I mean, even after students for fair admission, I don't think students for fair admission scraps the idea that remedial racial preferences can satisfy strict scrutiny. So if there's a motivation to remedy past racial discrimination and race conscious admissions or racial preferences are used to achieve that end, that would be racial discrimination. It would be racially motivated discrimination, but it would survive strict scrutiny under the Supreme Court's presence like Adirond and others that have said that this is a compelling interest. Now, if the Supreme Court ever overrules those cases, then I think it's a different situation, but I don't read students for fair admission as having overruled those cases. And do you understand students for fair admission to have changed the specificity as to what needs to be remediated? That is, what we have in the record here about past concerns, societal concerns, remedying discrimination historically. Is that sufficient? No, I don't think that's sufficient because Crozon says you can't state it at that level of abstraction. But Crozon is the case where the Supreme Court really delves into this idea of remedial affirmative action as a way of remedying past harms. And Crozon specifically says you can't just talk about societal past discrimination at an abstract level. You have to show that there were specific examples in this particular school district by these particular individuals at this particular time and that the remedy is narrowly tailored to those specific past acts. So it's a high standard. And I don't think students for fair admission changes that at all because really students for fair admission is more talking about the diversity rationale rather than the remedial remedying of past discrimination rationale. So again, I don't think students for fair admission change the law here. But Crozon would be the relevant authority to determine whether this is indeed narrowly tailored to that admittedly compelling interest that Your Honor points out. So when we have the Pew study in the record and there's an education that people are getting in for reasons of legacy and the demographics from the prior policy reflect people who are not qualified even under the stated terms for eligibility, why isn't that enough? It would be enough if that were the only reason. But the evidence of the record shows that's not the only reason. If you look at Sabria Jubilee's deposition, she doesn't talk about the Pew study at all. She's talking about reviewing these admissions policies through an equity lens. She mentioned the disproportionate racial impact is by definition inequitable. If you look at the statements of Karen Lynch and Sabria Jubilee, both made to the hearing, the city council hearing on December 15th, 2021, they talk about how these changes were made in response to the murder of George Floyd and how they reviewed all their policies in response to that episode with the eye toward increasing equity in the school district. You look at Superintendent Hyde's deposition, there are many statements in the record showing that there was a desire to achieve racial balancing for its own sake in addition to these permissible objectives that were cited in the Pew study. And the problem is if you have a mixed motive situation, that's unlawful. Even if you change policies, both for benign reasons and for the desire purely to achieve racial balancing, that will still be unlawful under the current precedent. And again, all we have to show here to get past number of judgment that there is a fact question, genuine dispute of fact on the issue. And the city has to show there's no possible way to interpret the record. Can we go back for a moment to that showing as to disparate impact? Because you seem to be saying that you believe you have a need to show a disparate impact. Let's put aside, you've also suggested that it's part of any admissions policy and that may, just because it's an admissions policy, maybe you don't need to make a showing at all. Let's say we don't agree with that. And we want to see in the record something that has statistical significance on the face of it, or perhaps it has required an expert. There seems to be a disagreement between you and the district here as to what the relevant comparators are. And when we look at table E of the offers that are made, and we have the percentage of eligible applicants, basically one-to-one with those who are offered admission, why does that show disparate impact? And why isn't that the right comparison? That can't be the right comparison because they are comparing, they're using the new definition of qualified. And then they're determining the racial breakdown of the qualified applicants under this new definition, and then pointing out the same percentages wound up getting offers of admission. We have to compare what things were before the changes were made, or to some other world that exists without the changes. They're using the changes that they themselves adopted as development-based, because they're saying, here are the people who are qualified under our new definition of qualified. Here's the racial breakdown. And then we look at the percentages of those who got admitted based on that racial composition. That can't possibly be the right baseline. That just begs the question. Why do you need to show disparate impact there? You're saying the relevant comparison is to what came before a sort of simple year-over-year comparison. Well, it could be anything, Your Honor. We're not actually taking a position on what the proper baseline you want. You can compare it to the overall city population as far as we're concerned. There's going to be a racially disparate impact simply from the fact that they're getting zip code preferences to these six zip codes that have almost zero Asian-American. That seems to be the nub of your case is that you argue that those six zip codes are a proxy for race. That's part of it, for sure. And again, for disparate impact, that's enough. Doesn't mean we win because we still have to go on to show racial motivation. But if you just look at the statistics of the racial composition in those six zip codes, hardly any Asians are there at all. And that's going to have a racially disparate impact when you give preferences to zip codes that have no Asians in them. Again, that by itself is not unlawful. But to show disparate impact, that's enough to create a fact question on the disparate impact problem. We do need to go on to show that there's also racially discriminatory motivation, which is a separate issue. We ought to show both. But again, disparate impact is a pretty easy hurdle for us. I mean, yeah, we'll get cribs. Look how easy it is to show disparate impact. The Second First Circuit has said you can't look at the prior year as this immutable standard. That's not the relevant comparison. What's your answer to that? It's not an immutable standard, Your Honor. They are allowed to change their emissions policies any way they want to, as long as they don't do it out of racial motivation. We're not suggesting that the prior policies are locked in for all time. But if you change the policies for racial change, that is a violation of federal law. That's going to be true at any level. The university level, the high school level, it doesn't matter. But that argument's tantamount to saying the First and the Fourth Circuits applied the wrong methodology. They did, unfortunately. I mean, on the disparate impact point. Right. If we rule for you here, we have to create a circuit. I think that's right. I mean, I wish there were a way to thread this needle, Your Honor, but in candor to the court, I just don't think the Fourth and Fourth. The Fourth and Fourth Circuits are just factually wrong to say that our argument is making the prior system into a mutable quota. Because, of course, you can change the emissions policies. You just can't do it for racially motivated reasons. And I think the problem is- I could say, Philadelphia could say that every zip code in the city will have a pro-rat or representation in the 19 selective schools or the four most elite schools. Full stop, period. And if they do that, that probably wouldn't- they could plausibly argue there's no racially disparate impact there. They could plausibly make that argument. But I think any other criteria you use, whether it's academics, whether it's athletics, whether it's first come, first serve, there's going to be a racially disproportionate effect no matter what you do, just because it's just a reality. Not every- these criteria are never going to be equally distributed. So because any change will always cause a racially disproportionate effect, then any time you change the criteria, if there is any hint of racial motivation, then the impact falls out of the analysis altogether. Well, I wouldn't say hint. We have to show by preponderance of the evidence, ultimately, a trial. Well, no, I'm talking about at the summary judgment stage. Yeah, at the summary judgment stage, as long as we have a genuine dispute of fact over whether racial motivation was involved, we're going to get to trial on that issue, for sure. Because, again, maybe we lose a trial. Because we're going to have to show, again, it's more likely than not that these ultimately were the motivations that led the city to adopt the policy. And then, of course, to get the damages, we have to show even more. We have to show that our clients didn't get into the school of their choice because of these changes. Did you ask for damages? We did ask for damages, yes. But now, again, we don't have to prove damages at this stage. We may ultimately not be able to get damages at trial. Because we have to show, really, but for causation. Well, setting aside the First and Fourth Circuit's decisions, we still have our decision in Lower Marion. And we do talk about impact being necessary to prove. Of course. Both for standing purposes and because that's what Arlington Heights requires. Yes. So I'm not sure how to fit in this theory that, you know, there will always be an impact of some kind. And therefore, it has to be attributed to race if the motivation was race. How do we fit that into Lower Marion and Arlington Heights? I don't see any inconsistency with either of those cases. I mean, Arlington Heights just goes to how you go about proving motivation in the absence of direct evidence. Arlington Heights allows you to create a case for racial motivation based on circumstantial evidence. We're not relying on Arlington Heights here. We have direct evidence. It also says that when you have a racially neutral policy, you need both the motivation and the impact. It does. Right. Right. Again, we admit, Your Honor, we've got to show both. We're just saying that it's a pretty easy standard to show disparate impact. It's much harder to show racially... Almost. I hear you saying it's automatically shown. Not quite automatically. We didn't quite go that far. It's an easy showing to make. Because almost any admissions policy... Well, it wouldn't have been easy to show if the representation of your clients all went in one direction, right? I'm sorry. What do you mean? I mean, it's easy to show racial impact if the racial impact moves in the direction of articulated by the plaintiffs or... Sure. It moves in any direction. But it could move in the other direction. It could move in the other direction. You're saying... I hear you saying that it's always going to change. But it has to change in one direction for you to make that easy showing. And you're saying it's an easy showing here because when you look at these numbers, it's clear that the proportion of black and Hispanic students went up. I think we can make a showing if it moves in any direction, Your Honor. In any? Well, then it's not much of a standard. It's an automatic. It's a given. But you still have to combine it with the evidence of racially discriminatory voting. Imagine a scenario where... Well, but I just don't understand that because if you have one plaintiff here who was a white plaintiff, and let's say there was all kinds of... Let's say your plaintiff was an Asian plaintiff, okay? And let's say there was all kind of statement in the record of racial discrimination against Asians all across the board. Superintendent, school district, we have too many Asians in these schools. It's not fair, right? Well, if it turns out that in the next year, the policy that you challenged, the Asian representation went up at the elite schools, do you have a case? Is it your argument that you still have a case? No, no, I would not go that far, Your Honor. That's right. So if they have a motivation to achieve a certain result, and they go about it in such an incompetent fashion that it backfires on them and produces exactly the opposite effect of what they intended, then no. What if your Asian plaintiff says that, yeah, Asian representation went up, but it went up 5%. It should have gone up 30%, and I'm aggrieved. Because he's saying, essentially, you are adopting... More Asians applied. More Asians scored well on the test. Who knows? It could be a variety of factors. Yeah, I mean, there are all sorts of ways... Are you saying you still have a case? It's going to depend exactly how he's going about this. But if his claim is going to be that the school district has a policy that reduced the number of Asians that would otherwise have been admitted, and that's his argument, and he can prove empirically that that was the case in terms of the outcome, and he can also prove empirically that there was evidence of racial motivation, he would have a case. All right. But you would have needed an expert. But you'd need a sophisticated expert on that. I don't think you need an expert. And here you're saying you don't need an expert because just look at the numbers. I mean, at SFFA, you look at the evidence there at SFFA, this is essentially, Your Honor, hypothetical. Asian Americans were getting into Harvard at a rate higher than their overall representation in the population, but they weren't getting in as high numbers as they would if Harvard had not been engaging in racial preferences. But then go back to Table A of the Wolfer Declaration. As Judge Freeman was pointing out, those percentages shift over the years. And in some cases for Asian and white students, they go up after the policy is implemented. So, I mean, if you're telling us now that if you see effects like that and you don't have a case, then don't you have a problem? No, because again, we're not saying the relevant baseline is going to be the previous year. You can choose the baseline just to be the overall population of the city of Philadelphia, or perhaps the overall student, eligible student population of the city of Philadelphia. Whatever criterion you use to admit your students, unless it's going to be something that's designed, such as random admission by lottery, designed to mirror the overall racial population, it's going to have a racially disparate impact. Anything that considers athletics will have a racially disparate impact. Any consideration of academics will have a racially disparate impact. And all that's okay, as long as the reason for adopting that criteria is because they want to have a good athletic team or a good academic class, not because they want to change the racial makeup of the class because they don't like the way the current racial makeup of the high school looks. That's the problem. So again, we have to go back to the language in Freedie. Was this done because of, rather than in spite of, the effects it would have on a racial group? All sorts of policies have effects, disparate impact. Disparate impact is never enough in any area of the law to show a violation of anti-discrimination norms. You have to go on to show that there's something else, a racial motivation behind the policy that leads to that disparate impact. And we've done at least enough to get to a trial on that question here. Okay, all right. We'll hear you on rebuttal. Mr. Mitchell, let's hear from Mr. Borkowski. John Borkowski on behalf of the Appellees, the School District of Philadelphia, its board members, and several of its administrators. The record in this case simply does not support appellant's contention that there's a genuine issue of material fact. With respect to whether strict scrutiny should apply to the 2022 admissions policy, that was in effect at the four schools that their three clients applied to four years ago. They effectively argue here today that any time a school district changes any policy at all, it'll be subject to 14th Amendment and Title VI claims. If anyone in that school district says anything about equity or says anything about racism, that's not the law. There are two independent bases for this court to affirm Judge Kenney's well-reasoned decision below. First, despite counsel's repeated protestations, there really is not a genuine issue of material fact here with respect to intent. There is not evidence that shows that the school board adopted this plan because of some desire to achieve some racial effect. How do you square that with Indicator 4.1? Yeah, Indicator 4.1, Your Honor, as Judge Kenney found, doesn't deal with admissions at all. It deals with qualifications. It deals with trying to improve the education of African-American and Hispanic students, and it was not part of the admissions process. But it is articulated that way, but then the district put in place a policy that changes eligibility standards so that as the Wolfer Declaration Table E makes clear, that eligibility becomes a match for the offers that are made. So how can we look at 4.1 and not read it to effectively make racial balancing proportionality as to the offers that are being made? There's no evidence in this case that the qualifications were changed in any way to make African-American or Hispanic students more likely to be admitted. The evidence instead shows that the qualification criteria were increased. They were raised. There's no indication that the raising of those standards that the district court found had anything to do with race whatsoever. What the school district did was move to a system that was centralized and objective away from one that was subjective. I understand the articulation, but in evaluating whether there is a genuine dispute here, we're looking at whether there's enough evidence in the record for a reasonable jury to come to a different conclusion than what you've put forward. And when we have the district saying explicitly that its intention is to grow the percentage of Black, African-American, or Hispanic Latinx from 33.8% in August 2020 to at least 52%, making progress toward being proportional to the population as a whole by August of 2026. And then we have the changes in eligibility standards that mean that the eligibility percentages are effectively a one-to-one match for the offers made. Why don't we have, just on the face of it, articulated intent to engage in racial balancing? There's no evidence in the record below that the eligibility criteria were changed in a way that made it easier for African-American or Hispanic students to qualify. There's no evidence of that whatsoever. That presupposes that the entire apparatus, the superintendent all the way down the school board, did nothing to follow up on what Judge Crouse just read. Why would we presume that? That seems like the least likely presumption. No, they said it will grow. It will grow from 33.8% to at least 52%. Well, if it will increase like that, changes were made. Isn't the Occam's razor assumption that the changes were made to implement what was just stated? But there are no changes that were made to the qualifications criteria. Getting rid of the PSSA in favor of a writing test that an expert said should not be used for admissions, that could have changed things. I don't know, but I assume that if we send this case back, they're going to have to try to marshal evidence to show that the performance by race changed once the PSSA was scuttled in favor of this writing exam, correct? Your Honor, the PSSA was not scuttled by the school district. The state of Pennsylvania quit giving it. Because of COVID, right. But then it could have easily been reinstated, and it wasn't. It was scuttled in favor of a different test. It moved in a different direction. Actually, no, the state didn't administer the test, and so the data was not available. If you look at Dr. Wolford's declaration, she makes clear that as soon as the PSSA tests were available, the PSSA was put back in place. So they're using the PSSA now? They are.  Yeah, and they have been since... And so is the MI right still being used for the selection process? It's not. In fact, Your Honor, that raises another point. So that's interesting. So this case really just involves sort of an interregnum period between COVID and the present? In large part, Your Honor, because the process has been evaluated each of the last four years and been revised. The zip code preferences are updated. The PSAA came back in when some of the other tests accepted have been altered over time. The updating of the zip codes does support your argument that this is about geography, not race. But it's also true, isn't it, that we should look at the Asian representation in those zip codes? Because if there are precious few Asian Americans living in the zip codes that are very greatly preferred through this automatic admission, that could raise an inference of discrimination against Asian Americans, couldn't it? There's several problems with the zip code analysis offered by appellants. First... Well, forget about what they offer. If you could address what I just proposed. Yeah, absolutely. Let me ask the question more directly. If the zip codes that are getting this, you would agree, would you not, that this automatic admission is a great benefit to folks that live in the, let's call them the disadvantaged zip codes, correct? Yes. Okay. And if there are precious few Asian Americans living in the disadvantaged zip codes where this great preference is awarded, does that not raise a possible inference of discrimination against Asian Americans? No, it doesn't, Your Honor. Simply picking a geographical area based on race neutral criteria does not create an inference of discrimination against Asian Americans. If you look back at the court's decision in Lower Marion, whole areas were assigned based on geography with the school district knowing specifically that there was going to be a specific calculated racial effect, more of an effect on African Americans. And this court said that's not discriminatory, found there was not a discriminatory intent or discriminatory impact here. So under Lower Marion, I don't think that's problematic at all. And in fact, Dr. Wolfer made clear that race was not considered at all in the selection of the zip code. Yeah, she helps you tremendously, but there are other comments from Haidt, Jubilee, and Lynch that go in the other direction, correct? They're not, Your Honor. There are no comments that suggest anywhere that the zip codes were selected based on race. In fact, there's no evidence that the race of the zip codes was ever considered by the school district at all. There's no direct evidence of that, but we have the goals and guardrails documents. And then after the new admissions policy was adopted, the challenge admissions policy was adopted, the school district made a statement that the changes were made consistent with the goals and guardrails document and its commitment to anti-racism and equity. So why couldn't a reasonable fact finder connect the dots between those? Because the changes, there's no evidence suggesting that the changes have anything to do with race. This is not a case like Lower Marion or Fairfax or the Boston case where the school district looked at the exact racial impact of projected activities. The statement, the quote is that the changes were made, quote, in alignment with our commitment toward anti-racism and equity as outlined in the Board of Education's goals and guardrails. And we have guardrail indicator 4.1 that talks about the proportionality and qualifications. Anti-racism and equity is not a motive to benefit or harm someone because of their race. What was the definition of educational equity in the glossary here? Your Honor? What was the definition of educational equity in the glossary? I don't have that at my fingertips. If you look at Appendix 6, do you have the appendix with you? Do you have the appendix? I do not have the full appendix. Okay. Well, I can read it to you. It's at Appendix 680. Educational equity is defined as raising the achievement of all students while eliminating the racial predictability and disproportionality of which student groups occupy the highest and lowest achievement categories. That's a pretty clear statement of racial balancing. No, that's not a statement of racial balancing. That's a statement saying that all students to achieve. Eliminating the disproportionality of which student groups occupy the highest and lowest. Yeah. It's not a statement about enrollment. It's not a statement about admissions. So, I want to take you back though to if we look at Table E, we look at the percentage of eligible students and the percentage of eligible students offered admission. Because of the changes that were made in admission policy, the percentage of eligible students is one to one or very close to it. With those offered admission. So, where is the distinction to be made? You're saying that's about eligibility, that's about qualifications. But don't the changes that were made make the outcomes proportional? No, Your Honor. What Table E shows is that the percent of eligible outcome, eligible applicants in both years is reflected in the percent who were offered admission. Showing that the process is actually fair. That the success rate of students reflects their presence in the eligible applicant pool. That's the success rate analysis that's called for by the TJ versus Fairfax case. In the Boston case. So, if the current percentage is 33.8 percent of eligible applicants for Black and Hispanic students and the goal is to raise it to being proportional to the population as a whole at 52 percent, where the percentage eligible is the percentage that's offered, how is there any distinction between eligibility and the proportionality in the intended outcome? There's no evidence to suggest that there's anything that was done to change the percentage of eligible people. The eligibility criteria, as I said, increased. The changing in the testing was not done by the school district and was in fact done two years before. And if you look at Table B in the Wofford Declaration at Appendix 139, what really happened here is you see a huge increase in the applications for Black and Hispanic students at Palumbo from 287 Black students in 2021 to 438, 156 Hispanic to 266, 157 Black students. So, what you have is you have more African American and Hispanic students applying. That's really what drove the change in the percentage in the eligible applicant pool, because if there's more applying, there's likely to be more eligible. And so, it's really the applications that came in and increased in 2023 that drove the increase in the eligible applicants among Black and Hispanic. Do you agree that it would be unlikely for a student to apply if you weren't eligible? Pardon me? Do you agree that it's unlikely for students to apply to these criteria schools if they're not eligible? No, I don't, Your Honor. I mean, it's clear that in 2021-22, 587 ineligible, unqualified students were admitted under the prior program. That's in the Wofford Declaration at 134. So, there were 587 ineligible students in 2021-22. Not only that applied, but actually got in. So, no, I don't think it's unlikely that ineligible students will apply. Can you point us to where the numbers are that account for the percentage of eligible applicants in 2021-22? Yes, that would be at the school district website cited in footnote one of the Wofford Declaration, appendix 126. And all of the data on the racial composition of schools and offers is posted on that website going back years. In fact, I just went back and double checked on the Palumbo enrollment earlier this week. But where specifically is there data on the raw numbers of eligible applicants in 2021-22? The raw numbers of eligible applicants, I do not believe those are in the appendix. I think they would be on the school district website. Mr. Borkowski, do you agree with your friend on the other side when he answered that we would have to create a circuit split with the First and the Fourth Circuit if we were to rule against your position in this argument? I do, Your Honor. And I think you would have to create a circuit split both on the issue of intent and on the issue of impact. I think there are now, I think this is an easier case in those cases. And I also think you would create a really problematic situation for school districts because as counsel admitted today and admitted in this reply brief, their view is that every change in every admissions policy automatically has a discriminatory impact on some racial group. They also have this very low standard for intent. And if you combine that, school districts are going to be subject with litigation from the African-Americans and the whites and the... Well, I understood what you, your critique of what Mr. Mitchell said about impact. I don't understand what you're saying about intent. What do you mean by low standard? Isn't it pretty straightforward that if they have a trial, they have to prove beyond a with a preponderance of the evidence that there was a racially discriminatory motive. Isn't that the standard? It's sort of fixed that way? Or do you mean something else when you say a lower standard? What I'm saying is that in a race neutral way, this school district went about trying to correct or bias, including possible racial bias in an existing system. And that is not... Doing that in a race neutral way is not discrimination. As Judge Kinney found, that's the opposite of discrimination. You touched on the issue we talked about before about remedy. Is this a remedial scheme or not a remedial scheme? Is this a race neutral scheme that's not remedial or is this discrimination to right past wrongs? I think it is a determination to right past wrongs, although not explicitly racial past wrongs. I think the past wrongs that the record is clear the board was focused on are unqualified students getting in at the expense of qualified students in some geographic areas because of the subjective nature of the prior process. Students didn't apply to these schools. When they applied, they were less likely to get offered. And even when they were offered, they didn't accept those offers because the feeling was that these weren't schools that belong to everyone in the community. And that's why this rotating zip code preference was put in. So there wasn't explicitly racial motive for either of the changes. And as I said at the outset, there really were not changes that are tied in any way to the outcomes in the qualifications because the main changes in the qualifications were an increase in the standard and the fact of COVID, which the school district couldn't do anything about. You're identifying that the goal as remedying things like the subjectivity and that certainly featured large in litigation. But we have throughout the record statements about concerns with the disproportionality as a system of racial equity, that the disproportionately low representation of Black and Hispanic students was problematic, that that needed to be fixed. And in the explanation for these changes for the new admissions policy and criteria that were articulated at the time, articulated to city council, the explanation was as to addressing these problems and that it was in response to the murder of George Floyd, not that it was in response to the Pew study. So why isn't there enough in the record for a jury to make the determination about what the actual motivation was? Because most of the things that you just referred to, Your Honor, if you look at the context and you look at the district court's analysis of the context are in discussions in depositions, not about the admissions process, but about the general beliefs of the school administrators. They're not tied. Most of them are not tied to the school admissions process. In fact, all of the administrators involved testified that they weren't concerned specifically about racial demographics in modifying the admissions process. Okay, we'll hear from your colleague, Ms. Sharfstein. MS. SHARFSTEIN Good morning, Your Honors. Allison Sharfstein for Amici NAACP Legal Defense Fund, Asian Americans Advancing Justice, Latino Justice, the ACLU, in support of ACLU. May it please the court. The court should affirm the district court's grant of summary judgment on both intent and impact. I'll start with intent and try to pick up on some of the questions Your Honors have been asking. As my colleague was explaining, a commitment to anti-racism or to improving academic outcomes for students of all races is not discriminatory intent. That theory failed as a matter of law because, of course, under this court's precedent in Lower Merion, an awareness or a consciousness of race is not the same as a racial classification or racially discriminatory motive. And so as the district court aptly observed, the school district's consideration of the flaws in the prior admissions process and its attempt to adopt a new policy that safeguards against the potential for racial discrimination is the opposite of a discriminatory motive. MS. SHARFSTEIN So we have cases like Lower Merion where there was a separate independent reason for making a change, and then there's consideration of in the line drawing that has to be done for other reasons, what effect that will have on racial demographics of the school. But you'd agree that it's different if the articulated reason for making the change is to change the demographics of the school, right? MS. TAYLOR Yes, Your Honor. And I think there's – I don't think the evidence here suggests in any way that district decision-makers were trying to change the demographics of the school. So the way I read Indicator 4.1 is a goal to make sure that students of all races are achieving equally. It's consistent with the equal protection principle that all students deserve equal educational opportunities. And that if you have students of some groups, whether it be race, whether it be learning disability who are achieving far below other students, that that warrants the district's – not to racially balance, but to correct for flaws in the way district's providing its education that may not be allowing for equal educational opportunities. MS. KAYESS So that would make sense if what we were talking about was funding of things like a language program or algebra, if that were a criteria, in the primary school system or the middle school. But what we have here isn't allocating of resources to improve the achievements to meet the existing criteria. It's changing the criteria themselves to affect the demographics. Why isn't that on its face a goal of proportionality and impermissible racial balancing? MS. O'MARRA Yes. I think I have two answers to that. First, I think that Indicator 4.1 is that goal you were talking about. As my colleague explained, there's no evidence in the record connecting Indicator 4.1 to the changes to the admissions policy. So I believe Indicator 4.1 suggests the point you're making about resource investments, about removing barriers to algebra, which is a requirement for mastermind and does prevent otherwise qualified students from achieving admission to that school. So I think that's what Indicator 4.1 is about. In terms of changing the eligibility requirements, yes, the district is, of course, in charge of setting the requirements for admission. But the Pew study showed that the criteria they previously selected were leading to inequitable results based on neighborhood. There were some neighborhoods totally unserved by the criteria-based high schools because of sort of social feeder patterns that were allowing unqualified students to be admitted, for example. And so those were the reasons that the district moved to a new set of eligibility criteria. And you can imagine that happens often in education where a new assessment, for example, is found to be a better metric of student performance. Or high school teachers decide actually they do need eighth graders to have taken algebra. And so a district needs room to change its criteria. And here there's no evidence that the criteria selected were intended or did specifically harm white or Asian students. Going to a lottery treats all students equally. We've talked about why the ZIP Codes were selected as the ZIP Codes previously. It depends on who's affected by the lottery, doesn't it? Well, certainly only eligible. Would you – what if the six ZIP Codes – you said it's just the lottery. It's just the six ZIP Codes, right? What if the six ZIP Codes were 97% Asian and white? You're fine with that? Well, again, I think it would go to why the ZIP Codes were selected. Here the ZIP Codes were selected not – with no awareness of their racial demographics. And to fix the problem that district administrators identified of certain neighborhoods not having access to the criteria-based high schools. One of the few study findings was that students in these ZIP Codes weren't applying at all. If they applied, they weren't considered. If they were admitted, they chose not to go because students from their neighborhood presumably were also not going. So that's the reason for selecting these ZIP Codes. Right. So if it's geography, you win. And if it's race, you lose. But why isn't that a tribal issue of fact when we look at these six ZIP Codes having almost no Asian representation? Well, one thing I'll just point out about the ZIP Codes is that the census data appellants rely on is – or the data that appellants rely on is census data. So it's not the school district or school-age children demographics in those ZIP Codes. So I think there's – that may not – Your argument that the 1.7 percent of Asians in a ZIP Code that they're averaging seven children per family, I mean, that – it would take – it would take really a lot to skew those numbers, wouldn't it? Sure, Your Honor. I mean, again, I think what I would point out is that the district selection of these ZIP Codes was intended to address a particular flaw that the Pew study identified and was done without any awareness of race. And, you know, all the students in those ZIP Codes were treated equally, which, you know, figured into this court's reasoning in Lower Marion for not finding that the selection of the neighborhood there had a discriminatory effect on black students, for example. So the ZIP Code preference accounts for a pretty small slice of the schools. I think it's like 14 percent at Center and Carver and only about 8 percent of enrollment at Masterman and Palumbo. And all students in those ZIP Codes are treated the same. And it led to an increase in the number of Asian American students from those ZIP Codes who enrolled before and after the policy, which, you know, was the district's goal to give students in these ZIP Codes some additional access. And then the ZIP Codes change year to year as – you know, to reflect the current most underrepresented ZIP Codes in the criteria-based high schools, which, as I understand, are meant to serve the entire school district. So it would make sense that the district wants to ensure that not just some neighborhoods or some, you know, feeder middle schools are having access to those resources. Where is there evidence in the record that they change or what they have been changing to? That's a good question, Your Honor. I know we cite to it in our amicus brief based on a letter that went out to parents for the – I believe before the 2023 cycle, but I don't have the page here. It announced the new ZIP Codes and there was some overlap, but it wasn't perfect overlap. Exactly, Your Honor. On the district, I see I've exceeded my time. I think we're all set. Thank you very much, Ms. Sharfstein. We'll hear rebuttal from Mr. Mitchell. Three points on rebuttal, Your Honor. First, Mr. Borkowski mentioned the changes have been made to the admissions policies in the criteria-based schools. The PSSA test is back. The MyRight essay test is no longer being used. But the court should not – in fact, the court cannot consider any of that because our clients are not seeking prospective relief. Our clients no longer have standing to seek prospective relief. They have settled in. Your simple response to that is that that might mean that they're in much better stead now, but it doesn't help them for the window of time that you're focused on. Exactly, Your Honor. We're suing for damages because our client's children will be graduating next year, so we no longer are seeking prospective relief. So the court has to examine these policies as they existed in 2022 when our clients replied. Perhaps in a future lawsuit, if someone wants to bring a class action suit for an injunction, then the court can consider whether these new policies comport with the law. But for the purposes of this case, it has to be based on the policies that were implemented and used during that 21 to 22 admissions cycle. Number two, Mr. Borkowski says that our interpretation of disparate impact will lead to a flood of litigation against school districts. We know that's not true because we have a disparate impact regime in Title VII as interpreted in Griggs against Duke Power and codified in the Civil Rights Act of 1991. In employment discrimination cases under Title VII, a plaintiff can show a disparate impact and then flip the burden of proof simply by showing a disparate impact to the employer, who then must make a showing of business necessity. That is an even more plaintiff-friendly standard, a far more plaintiff-friendly standard than what we're describing here. We have to show not just disparate impact, but disparate impact combined with evidence of racial motivation, and the burden of proof is on us throughout. We have to show at trial, by a preponderance of the evidence, that this racially disparate impact was also motivated by racial concerns. And that burden is on us in its entirety. The disparate impact regime has not led to a flood of lawsuit against employers. There's no reason for this court to think that endorsing this view of disparate impact in this case will open the school districts to litigation. But we've never before said that because there's always, and any change to an admissions policy results in changes to the demographics of the students offered admission, then we don't really have to consider disparate impact. Well, that's not what we're arguing either, Judge Freeman. We're just saying that when an admissions policy is going to have some criterion that is not going to have an equal effect on the races, that's all you need to show disparate impact. It's just akin to the high school graduation requirement in critics. Not every academic talent and ability or athletic talent or whatever criteria you're using is going to be symmetrically shared among members of different races. But what change to an admissions policy would not have an asymmetrical effect on this? Well, something where you have traditional public schools where they take all comers, or something where admissions is done purely by random lottery, so you can have as close to a representation of all the racial groups as possible. That's never going to happen with a criteria-based school. It seems like you're still saying because you have a criteria-based school, there are criteria, and it will have a disparate impact. So whenever you have any evidence that a reasonable fact finder could say was discriminatory intent, then you're done. That's right. But that's also the law in Title VII, and that's also, it's an even more pointer-friendly standard in Title VII, because any criteria for a job will have a racially discriminatory impact. But it's so easy for employers to beat that back by showing, we have business necessity to require that you graduate from college if this is the type of job you need a college degree for. And schools can do the same thing just by showing, they don't have to show business necessity, but they can just show that we had a legitimate non-racial reason for adopting this, and the consideration of this policy change was not motivated by race. And that should be an easy requirement, an easy showing for them to make, as long as they're doing it for benign reasons and not for the purpose of racial balancing. The problem we have here with this record is there's evidence throughout from Sabrina Jewelly, from Karen Lynch, from William Hite, from the goals and guardrails documents, from the anti-racism declaration throughout this entire record showing that a big part of the reason that these changes were made was to change the ultimate racial composition of the schools. And in doing that, that is going to be a problem if you make the policy change because of, and not in spite of, the effects it will have on members of races. Mr. Chairman, we have said when we're looking at disparate impact that a plaintiff needs to show statistical evidence of a kind and degree sufficient to show that the policy or practice in question caused the discrimination, in blunt. And the Supreme Court has said that the statistical evidence necessary for disparate impact claims requires the plaintiffs to produce evidence that something besides random error is at work. That all suggests that you need to show statistical significance, not just that there is some change, any change to demographics, but that there's enough to draw an inference from that, that it's purposeful. True. And we've done that. That's the evidence that we have. I mean, look at the zip code evidence that we have about how the populations in the zip codes, the six zip codes that were given preference in the process have no Asians in them. Look at what we've shown in the tremendous drop in white and Asian, the office of admission at Carver, Central, and Palumbo after these changes were enacted, and the very large rise in Black and Hispanic office of admission to those three schools. All of that stuff on its face shows statistical significance, and we have a statistically significant racial effect based on what these school district policies have done. And then you combine that with the evidence in the record of racial motivation, we have enough at the very least to get to a trial on these questions. Again, I'm not suggesting to your honor that we've proven our case at this stage of litigation. I'm saying only that we have some evidence in the record to create a genuine factual dispute when this evidence is construed in the light most favorable to the plaintiffs as the non-movement for summary judgment. When you're pointing now to the zip codes, are you conceding then that the other changes that were made are not relevant to your claim? No, not at all. I mean, all of these changes are relevant. The zip code preference is just one of many changes that were made, adding this my right test, not bringing back the PSSA after COVID, deciding to admit students by lottery once they meet a certain minimum threshold cutoff, rather than by allowing principals to decide among the qualified applicants who they will choose. All those changes, every one of them has a racially disparate impact, either whether you consider it by itself, or they look at them in combination with the other four. The racially disparate impact has been shown at least enough to get to a trial on that question. And then again, we still have to go on to show that they were racially motivated, but we have enough evidence there as well to get to a trial. I see my time has expired, but I do have a third point to make if I'm allowed, but if the court is done, I'm going to sit down.  I think we're all set. Great. Thank you, Your Honor. Thank you to counsel for both sides. The court will take the matter under advisement.